Good morning. My name is Steve Dawson. I represent the appellate, Ms. Steigelman. May it please the Court. I'm going to turn to the Symetra's ERISA arguments first. Their first theory being that the Steigelman agency established an ERISA plan, and this argument fails because the Steigelman agency never, pursuant to 29 U.S.C. 1002.1, established or maintained an ERISA plan. MGC, the broker, created and maintained the TA group policy. It's clear from the evidence. The plan pre-existed Steigelman. It went on without her. Afterwards, staff who could sign up for the coverage, if they left Steigelman's agency, for example, and went with another Farm Bureau agent, they could continue their coverage. So the plan, this really is kind of dispositive on this first issue because the plan could not be on the Steigelman agency established or maintained under ERISA, given that it was there before, it was there after, and her staff holding on to any coverage wasn't dependent upon their employment relationship with the Steigelman agency. And even if that were not the case... Were they otherwise eligible? Were they... If they hadn't been working for Ms. Steigelman, could they have received benefits? Staff of Farm Bureau agents who are members of the Agents Association are eligible. And that's how they became eligible? Correct. And I thought I read in the record where she paid their premiums for them. She did. She did pay their premiums for them. However, evidence of premium payment is not sufficient to establish a plan by itself. It's evidence of it. This goes back to this court's decision in Conn v. Connecticut General and the Dunn-Dillingham 11th Circuit case, which is so often cited. If, as Ms. Steigelman testified in her deposition, she said, I didn't do anything. They would get an email saying, you're now eligible because you've been with somebody for six months, an agent for six months. They'd go on the portal. They'd sign up. There's a box they could check saying either their premium would be deducted from the agents' commissions or it would come right out of my bank account, the staff members. If the staff member had checked the box, let's say it's going to come out of my bank account. Well, I don't think we would be here even arguing about this. I don't think Smith would even argue that somehow we have established or maintained an ERISA plan. But that's the only fact that they have. And that fact is not sufficient to conclude that there is the establishment of an ERISA plan. What about their argument that your client set different eligibility criteria? Yes, I did want to address that because the record doesn't support that. The six months of employment and 32 hours work per week were not requirements imposed on staff by Ms. Steigelman. Here's what the record is on this. There at 3 Supplemental Excerpt of Record 524, Paragraph 9, there is a declaration from a Symetra officer, Jennifer Whitmer, which indicates that it was pre-set already, the waiting period, and that the staff had to be full-time. The evidence that Symetra is relying upon, Ms. Steigelman was not even really asked this question. The question really didn't have anything to do with this. She was asked, you had a package, I guess, of benefits that you offered your employees. And she answered, if they made it to six months, they had the ability to choose and sign up at that time if they chose to. Yes, that was a requirement of the policy. Question, you offered disability coverage for people in your office, is that right? Well, I just let them apply for anything the Agent Association offered if they worked enough hours. They had to work at least 32 hours a week for me, and they had to be there six months. It was all done through a portal where they could sign up because they would get an email that they've now been with an agent long enough, so that was how it was handled. I did not do it for them. And if you look in the record at Excerpt of Record 448 and 450, you'll see the two staff members' enrollment applications. And it indicates that for staff, 20 hours a week is required. And Amanda Kelly notes that she works 30 hours a week. And Megan Hales, on her enrollment form, notes she works 25 hours a week. And they both signed up for coverage. Clearly, Ms. Steigelman was attempting to recite what she believed the requirements were for them to sign up. They were not her requirements. They signed up. They didn't hit this 32 hours. They hit what was imposed by Symetra. Did your client or your client's business pay the employees' premiums? I'm sorry, Judge Hawkins, did my client say that again? Did your client or your client's business pay the premiums for the employees? The agency did. So, premiums are deducted from the commissions that go to Jill Steigelman personally, both her own and her staff. She then claimed the staff premiums as a business expense on the agency tax returns, not her own. She paid in post-tax dollars. So, even if not, even if it was somehow determined that, well, though the plan preexisted Steigelman coming along and existed afterwards, and her employees, if they went to another Farm Bureau agent, could keep their plan, it was determined somehow that Ms. Steigelman created an ERISA plan for her staff. That did not convert Ms. Steigelman's policy into part of an employee benefit plan, which is really the ultimate issue, of course. This Court has said that the time that matters in looking at a fact scenario like this is when the plan was initially created. We see that in Peterson v. American Life and Health and LaVenture v. Prudential. Ms. Steigelman's policy, of course, was not and could not have been governed by ERISA because she's a self-employed owner of the business. Kennedy v. Allied Mutual makes that clear. And as in LaVenture, this Court said, there is no evidence that the two plans, then later when her staff acquired long-term disability insurance, there's no evidence that the two plans were initially established with the intent to create one benefit plan, as in Peterson. So either way, you don't get to an employee benefit plan. The second theory that they're using is that the Agents Association established an employee benefit plan. But TAA simply does not fit the statutory definition of employee organization under 10024. To qualify as an employee organization, Farm Bureau agents must be employees of Farm Bureau. Again, looking to the supplemental excerpts of record, at 524, there is a declaration from Symetra which says Steigelman was self-employed. She was not an employee. In Steen v. John Hancock, this Court said, the plain meaning of this provision in the cases involving employee organizations in the ERISA context indicate that this provision covers labor unions and other traditional employee organizations established by employees, which is not what the TAA is. And in Suroff v. Standard Insurance, the Court found that the Orange County Employees Association was an employee organization as defined by 10024, pointing out that it limits its membership to employees of Orange County. There are no employers, no self-employed individuals, or independent contractors can join it. Here, an employer-employee relationship has never been true. Symetra has never argued otherwise. It was an employer-employee relationship. Agents take on the economic risk in their business. They invest in their office space, their equipment, their staff. Even in the contract between the agents and Farm Bureau, it specified they're independent contractors for all of these reasons. Is it your position that even though the district court didn't reach this argument, that I guess the record is well enough developed that we could just resolve the question as a matter of law? Yes, Your Honor, I believe the record is well enough developed because once you get to the conclusion that the agents association is not comprised of employees, then dealing with employers about matters incidental to the employment, 1002-4 is just not satisfying. So Symetra really should not be able to avoid liability for the catfish conduct based upon an ERISA preemption argument, which was a statute that no one thought governed this arrangement before this lawsuit was filed. I'm sure you noted they answered not once but twice that ERISA didn't govern this dispute. Let me go on to, unless there's other questions to Bad Faith. Just one quick factual question. Is your client currently receiving benefits? Yes, currently she is, yeah. It is the unusual case where a cause of action for insurance bad faith does not involve tribal issues of fact. The Arizona Supreme Court noted that in Sparks vs. Republic. This court noted that in Amadeo vs. Principal, a mutual life insurance company, which was a California case, but California's bad faith standard is almost identical to Arizona's. Because the tort presents questions of the reasonableness of an entity's conduct as well as the state of mind. An insurer owes fiduciary-like obligations to its insured according to Zillich vs. State Farm, the Arizona Supreme Court, and those include equal consideration, fairness, and honesty. The test of good faith was described by the Sparks Court as being a question of reasonableness under the circumstances of the case and whether the insurer had knowledge of or recklessly disregarded the lack of a reasonable basis. Can you just jump to, because I want to make sure I have the facts clearly in mind, to that initial denial and why you think the defendant's conduct was unreasonable on that front. Yes. I think a reasonable jury could find that that original denial breached the implied covenant because the evidence is that the adjuster, Ms. Cortez, knew that there was a very recent medical record out there. She wrote to the doctor saying it's vitally important that we get it, gave him until October 26th to get it to them. She enters in the file denying the claim on October 24th, sends a letter out on the 26th. Okay, and they're saying that that's because we had a record from um, we had a record indicating that she, your client, was going to be able to return to work. I just, that's what I'm trying to get through. Yeah, so Ms. Steigelman had a conversation that day with the adjuster and the adjuster is telling her that we have this record saying basically you can go back to work and Ms. Steigelman says, well, I was just, I just saw the doctor on October the 11th, I think it was. That's the opposite of what he just told me. He said you can't go back to work, at least not before January of 2018. You're going to injure yourself if you do. Ms. Cortez testified, oh, I believe her. I believe that was true. Why not wait for additional records? Plus, that one record was contrary to the body of medical evidence that she had from the primary care nurse practitioner Trujillo and the physical therapy records. It just, and she could see from the record that Dr. Edashami, the surgeon who this record was from, had not even seen Ms. Steigelman since the last time he'd sent in a record because her surgery was May 30th. He saw her June 14th in follow-up after this significant surgery and then suddenly there's a record saying she can lift 40 pounds all the time. It just obviously was a mistake and I was going to save time for rebuttal. We'll give you time for rebuttal. So if you have a last point you want to cover, that's fine. Okay. I think the point in Arizona case law especially is pointing on this, that when they buy insurance, especially disability insurance, they're not just looking for some sort of commercial advantage. It's the notion of security and peace of mind. Ms. Steigelman was unfairly dealt with in the initial denial. She had to get a lawyer and fight with them. Then they imposed a 12-month limitation. They say they didn't, but you can see in the record that the facts are they did. And then they suspended her benefits after that and it got to the point where Ms. Steigelman decided, I don't know what's going to happen next because this is an adversary relationship I'm in, not knowing that behind the scenes what's going on that's causing all this pressure and all this adversarial activity in trying to shut down her claim, which also justifies, under Arizona standards, punitive damages. So I'll save it. We'll give you a couple minutes for rebuttal. Let's hear from counsel for the defendant. May it please the court. I'm Steve Bressler. I represent the Appalee Symmetra Life Insurance Company and with me at counsel table is Nicole True. The district court found that Jill Steigelman, as an employer, established and thereafter maintained an employee benefit plan governed by ERISA. This ground alone is dispositive. Because it found this, the district court did not reach the other reason that ERISA governed, and that is that TAA, as an employee organization, established and maintained an employee benefit plan governed by ERISA. The district court alternatively held that plaintiff's state law claims were not viable as a matter of law. These rulings were correct and should be affirmed. I will address the plan that plaintiff's insurance agency created and also the state law claims, and unless the court has questions about TAA being an employee organization that also established a plan, I will not address that due to time constraints. Is your view, though, that if we had to reach that issue that the record is well enough developed that we could resolve it as a matter of law? Yes. Okay. Let me ask you then about your first theory for why ERISA governs here. I guess I was inclined to think that the plaintiff was right, that all you have in your favor is the fact that Ms. Steigelman paid the premiums for the employees, and that I thought, again, that our case law was clear, case law from other circuits is clear, that you do need something beyond that. That's certainly a strong fact in your favor, but that you need something beyond that, and there just simply isn't anything here. Well, Judge, respectfully, there is more. And first of all, the case law says that the purchase of insurance alone may not be enough to have an ERISA plan, but it is evidence of an ERISA plan, and the purchase of a group policy is strong evidence of an ERISA plan. So if I can go through what... And this Court has said also in the credit manager's case and repeated in many cases since then, that an employer can establish an ERISA plan rather easily, even if an employer does no more than arrange for group-type insurance, it can establish an ERISA plan unless it is a mere advertiser who makes no contributions on behalf of its employees. So I'd like to talk about what Ms. Steigelman did. First of all, she testified in her deposition that disability insurance was part of a benefit package, and those were her words, a benefit package that she would provide so that she could hire qualified people. And she also said that, and I disagree with my colleague, that she was repeating what TAA required, but she said that her employees had to work 32 hours a week for her and had to be there for six months. That testimony's here. Well, obviously that was not the case, and she was, to the extent she thought those were the requirements, I mean, you heard your opponent indicate that those two employees didn't meet that standard, and yet they still got covered. So we know that that was not, in fact, any, right? So she testified to that, and the point I wanted to make was that the TAA requirement was 20 hours. She said hers was 32. But she had no such requirements, is my point, and we know that because the employees didn't work 32 hours and they still got the coverage. I can't speak to that. I don't know whether they worked less than 32 hours all the time or whether they ever exceeded 32 hours. Okay, well, I read that excerpt from the deposition, and it seems crystal clear to me that Ms. Steigelman was not trying to say that she had come up with her own independent minimum eligibility requirement. She was, as I think you heard your opponent say, just trying to repeat to the best of her recollection what the plan's eligibility requirements were. Well, even if it was TAA imposing the requirements or MGC on behalf of TAA, under the definition of employer in ERISA, which is 29 U.S.C. section 1002 paragraph 5, the term employer means any person acting directly as an employer or indirectly in the interest of an employer in relation to an employee benefit plan and includes a group or association of employers acting for an employer in such capacity. So even if we were to assume  that would fall within the definition of employer because they're acting on behalf of Ms. Steigelman. In fact, those were the facts of the Kahn case, the Kahn versus Connecticut General case, where you had Harlow Carpet, which was a member of the Associated Builders and Contractors. And the court said that the requirements, the work of the Associated Builders and Contractors would count as Harlow Carpet's work as well under the definition of employer. So even if you want to segregate that out and say, well, that was what TAA required, not her, it still falls within the definition of employer and would be something Steigelman Insurance Agency established. She signed up for this plan on her own initially, correct? Yes. Under our Love Venture Prudential case, isn't it your burden to show that they became intertwined with the employee's plan to get folded into ERISA? Well, they were because... So the answer to my question is yes. Yeah. So tell me how they were intertwined. Well, first of all, the case law, I mean, the statute says that an employer must either establish or maintain an employee benefit plan. So the most that can be said is when she first set it up, she was the only one covered. But then she later on added on employees. The difference between this case and the Love Venture case, in Love Venture, you had a health insurance policy and a disability policy, and they later added employees to the health insurance policy. The court said that might be an ERISA plan, but the disability policy only covered the employer, never covered any employees. We view that as separate. Here you have one disability plan. You don't have two different coverages. You have a group disability plan, and initially they were covered under separate policies, but by the time this claim came around, everybody was covered under the symmetric group policy. They were in different classes, but everybody had symmetric disability insurance. So that's what makes it intertwined, and that's what makes Love Venture different. Returning to the question of what did Ms. Steigelman do, as an insurance agent who was licensed to sell disability insurance and did in fact sell disability insurance, she made the decision what she would offer her employees. She could have offered them anything in the open market, but she limited them to what TAA had to offer, and then she paid for that. And I covered this a little bit, but in the past, TAA covered insurance agents and their employees with different group policies, but that was merely how they funded the program. So all they have to have is a plan, fund, or program. The insurance coverage is simply how you bring it about, and in this case, there had been separate group policies, but by, I think, 2017, everything was in, one symmetric group policy with different classes. There's no doubt that she intended to create this plan. As I said, she called it a benefit package, and she testified to this at her deposition. The most that can be said is that she didn't realize it would be governed by ERISA. I want to turn very briefly to the- Can I ask just before you move on? I thought in all the other cases, in addition to paying the premiums, the employer was involved in some much more significant way in administering the plan. And as I understand Ms. Steigelman's testimony here, she basically just said, I didn't do anything. They got this email, and after that, all I did was pay for the premiums. And so am I wrong in remembering that that's what our case is? Well, she did do more. I mean, she did select the insurance coverage. She did pay for it. And then in terms of NGC- She just seemed like that was it, and then it was all in the hands of these other folks. Right. NGC and TAA administered it, but under the definition of employer, which the term employer, under 29 U.S.C. 1002, paragraph 5, employer means any person acting directly as an employer or indirectly in the interest of an employer. So that is part of the definition of employer. Also, in this court's case of Peterson versus, I think it was American General Insurance, all that was done there was the purchase of insurance. They weren't, the company wasn't involved, the employer wasn't involved in the administration. And that's true for a lot of ERISA plans because when an employer buys an insurance policy to fund their ERISA plan, the insurance company's necessarily gonna be taking on a lot of the administration, not the employer. The employer wants to try to get as little burden as possible, but that does not mean they have not established a plan. Real quickly on the Department of Labor safe harbor exceptions, there are four prongs, and she's gotta satisfy all four prongs. The first one is payment, and it doesn't satisfy payment. The third one is endorsement, and she fails that as well because she directed them to the TAA plan specifically to the symmetric group policy. They didn't have a choice in it, and that's what makes this case different than the big case that they cited. Unless the court has questions, I'll now turn to the bad faith claims. Plaintiff's disability claim was accepted on February 6, 2018. That was over a year before she filed this lawsuit on February 27, 2019. She never missed a monthly benefit, even though she had returned to work for another company called Sabrous, and even though she was planning to go back to work with Farm Bureau. The court below, the district court, carefully studied the four arguments she put forth. The first was that she supposedly denied, Symetra supposedly denied her claim based upon a single medical record that it knew was incorrect, and that's false. Symetra had the surgeon, Dr. Edashami's office note of June 14, 2017. It had his patient restrictions and capabilities form of September 21, 2017, where he released her to work, and they had a confirming conversation with his office on October 2. So let me turn to each of those. Dr. Edashami's PRNC form indicated that she was released to work full time with restrictions on August 30, 2017. Symetra then called his office on October 2 to ask about that. Was that based on testing? And they were told it was. Another thing that's in the record that may not have been very well developed in the briefs is that on August, I'm sorry, October 18, Symetra's nurse, Kim Smigel, noted that the MD guidelines, which were a reference tool for insurers and employers, to tell them what is the anticipated duration of a condition, that the anticipated duration for a cervical fusion with a light-duty job was 42 to 63 days for return to work. If you look at, she had surgery on May 30, 42 days was July 11, 63 days was August 1. Dr. Edashami returned her to work on August 30, which was a very conservative return to work. So in light of that, Symetra was entirely reasonable in coming to the conclusion that she had recovered sufficiently to return to work. Well, even though after being told that there was an obvious mistake because she had just been to the doctor, and then, as I understand it, your client set a deadline, was it October 26, and then made the denial on October 23. I just, why not at least wait for the self-imposed deadline to see what additional medical records come in? The denial letter went out on October 26, not October 23, but they did ask for the record, and they did not get the record. Had they got the record, and- Am I wrong in remembering, though, that you did not, your client did not wait until the deadline that it itself had set to get the additional records before? I believe the deadline was October 26, and the letter went out on October 26. Okay, I thought it was sooner than that. All right. And the record, had they received it, was from October 11, and it's in the supplemental excerpts of record at page 197, and under assessment, Dr. Edashami wrote, see previous note. The previous note was the June 14, 2017 note where he indicated everything was going fine. So even if they had that record, it would not have changed the analysis. The analysis doesn't get changed until Dr. Edashami changes his opinion. The second argument they make is that when Symetra accepted the claim it improperly applied a special conditions limitation. Symetra actually pre-approved her claim on February 6, 2018. Most claims, the insured has a month of disability, submits the proof of loss, then they get the benefit. She was pre-approved, and the policy contains a special conditions limitation that is defined in the policy as to what it includes and what it doesn't include. It includes a musculoskeletal and connective tissue disorder of the neck. She submitted this claim based upon cervical stenosis. So it was entirely reasonable for the insurer to think that it applied. Symetra, and I'm going to hurry here because I'm running out of time, Symetra never improperly suspended benefits. When they wrote her, it was because they learned from John Matthews, the CEO and president of MGC, that she had returned to work, and it was based upon an internal Farm Bureau record that's found at SCR, this supplemental record at 668. And so they simply said, using the language of the insurance policy, your benefits are suspended until we get this information. They got it, they paid her the next benefit. She never missed a beat. And let me just finally say that their narrative about these emails is entirely backwards. Symetra wasn't looking for ways to deny her claim. In the face of heavy pressure from MGC and John Matthews to deny her claim, lower the reserve, lower the renewal premium, Symetra's claim department refused to do so. It continued to pay her claim, and as a result, lost the TAA account, which MGC moved over to Sun Life where it is today. Does the court have any other questions for me? No. Okay, thank you very much. Let's put two minutes on the clock for rebuttal. Two? Thank you. On the ERISA front, first of all, to say she purchased a group policy is not precisely accurate. That policy was there, it existed, and she bought into that policy. She didn't, unlike a lot of factual scenarios where an employer might do something, contact a broker, an agent, to go out and purchase group insurance, which is what one would think happened hearing the argument, was not the case here. And in terms of this intertwined or not, even though we're dealing with disability insurance and disability insurance, I think in many ways the facts are more stark than they were in LaVenture here. Because when Jill Steigman bought her disability policy, it was issued by Mutual of Omaha. Staff bought their policy later, issued by Unum, two different insurance companies. They eventually got put into Symetra, which was nothing that Steigman did. She had no control over these things when they were happening. This was all done by MGC. And in terms of who's administering, who's doing things, MGC is on record as saying it's the administrator. And it markets this. All of its material says, we do everything. You don't have to worry about a thing. The 30B6 deposition of the TAA individuals made that clear too. We're a policyholder name only. He was asked, well, did you get a discount? I don't know. I don't even know if they got a discount. This was an entrepreneurial venture, clearly. And then quickly just going to the bad faith points that Mr. Bressler was addressing. Dr. Edashami didn't change his opinion. He made a mistake. And in his deposition, he admitted that. I don't know where that record came from. It doesn't make any sense. But I think more importantly is Ms. Cortez's testimony that she knew that when she said at 2ER230, lines 3 through 18, I do believe Ms. Stockelman was telling the truth, that her doctor signed a record that she can't go back to work until January 2018. At page 248 to 249 of her deposition, she knew at the time that the doctor's form, she was basing it at the dialogue, that was in contradiction to the other medical information in the file. She knew that. Imposing the 12-month limitation on her benefits. By the time they did that, Sinetra knew that Dr. Edashami had diagnosed Ms. Stockelman with radiculopathy. Radiculopathy means a 12-month limitation doesn't apply. And just to be clear, the policy says document by an EMG, but the claim manager said we don't require documentation by an EMG. They knew at the point they imposed the limitation, it didn't apply, but yet they left it for, what, eight months. And then once they finally sent it to a nurse, Ms. St. Germain, who said, yeah, this doesn't apply, they then sat on it for three months before they even informed Ms. Stockelman, even though her lawyer from SHOLO was writing, emailing Sinetra saying, essentially, she's freaking out over this. She doesn't know what she's going to do, how she's going to make ends meet. Right, one concluding thought, because you're over your time. Okay. The emails behind the scenes, they were not resisted. First of all, for them to let them in the door. A concluding thought, I said. I'm sorry. That means wrap up, please. You're over your time. What was incorrect, and the pressures is what led to the denial, the imposition of the 12-month limitation, and then the suspension of benefits. And the surveillance, it made no sense that they did it. It was because of that pressure. Very good. Okay, thank you very much for your argument. The case just argued is submitted.
judges: HAWKINS, PAEZ, WATFORD